Breitel, J. (dissenting).
For convenience, the views of the majority and the dissenter who are agreed in entertaining the appeal and to reverse are treated as if comprised in a single statement of a majority position.
The appeal, taken as of right on constitutional grounds, should be dismissed as a criminal matter which by statute is explicitly made not appealable to this court.
There is no question that an appeal may be taken in criminal cases to the Court of Appeals only where the judgment is of death or the Legislature has made provision for such appeal (N. Y. Const., art. VI, § 3, subd. b). As for the review of court orders accepting or sealing grand jury reports, the Legislature has expressly provided in the plainest language that: “ The procedure provided for in this section shall be the exclusive manner of reviewing an order made pursuant to section two hundred fifty-three-a of this code and the appellate division of the supreme court shall be the sole court having jurisdiction of such an appeal. The order of the appellate division finally determining such an appeal shall not be subject to review in any other court or proceeding.” (Code Grim. Pro., § 517-a, subd. 7.)
In civil matters, the Constitution provides the extent of appealability, and, therefore, the Legislature by statute may not curtail rights of review except as may also be allowed by the Constitution (art. VI, § 3). Hence, if this matter were civil in nature, the Legislature had no power to preclude this court’s appellate jurisdiction.
The only question remaining, then, is whether the submission and examination of a grand jury report in the court for which the grand jury was impaneled is to be treated as civil or criminal.
The applicable constitutional provision contains no definitions of “ civil ” and “ criminal ”. In the past, without excep *212 tion, the court, in determining whether an appeal is controlled hy the criminal or civil procedure for appeal has respected the Legislature’s characterization of the proceeding. Quite emphatically it has not made the test whether a crime was charged. The most striking and most illustrative, but not the only, example of this approach is that of filiation proceedings. Thus, although such proceedings did not involve “crimes” and were definitely not criminal prosecutions, they were nevertheless treated as criminal when initiated in a court of criminal jurisdiction, yet civil when initiated in a court of civil jurisdiction (compare Matter of Clausi, 296 N. Y. 354, with Commissioner of Public Welfare v. Simon, 270 N. Y. 188, 191; see, generally, Cohen and Karger, Powers of the New York Court of Appeals, pp. 710-711).
The Clausi case (supra) is of particular significance, for the court, in deciding whether the appeal was on the civil or criminal side of the judicial system, necessarily construed the Constitution as well as the procedural statutes. At the time of the Clausi case, as now, the Legislature had a closely restricted power to vary the civil appellate jurisdiction of the Court of Appeals. Under the Constitution, leave to appeal to the Court of Appeals may be obtained in a civil case only through application to the entire court, be it Court of Appeals or Appellate Division (N. Y. Const., art. VI, § 3, subd. b, pars. [4], [5], [6], [7]; N. Y. Const, of 1894, art. VI, § 7, subd. [5], as amd. Nov. 2, 1943). Since there is no similar constitutional restriction for appeals in criminal cases, the Legislature may, and has provided, that leave to appeal to the Court of Appeals may be obtained through application to a single Judge or Justice (Code Grim. Pro., § 520). Thus, the court in the Clausi case (supra) held that filiation proceedings should be deemed civil in the constitutional sense, while in the Simon case (supra) the court held that the filiation proceeding was criminal, and that application for leave to appeal should be made either to a court or a Judge, depending on the forum provided by the Legislature.
The legislative determination to treat the grand jury report proceeding as criminal in nature is not without ample basis. Under the Code of Criminal Procedure, the grand jury must, in most investigations including the instant one, confine its *213 inquiry to the commission of crimes (§§ 245, 253, subd. 2; see Matter of Wood v. Hughes, 9 N Y 2d 144, 151-153). A grand jury report concerning noncriminal conduct is to be based, at least initially, upon facts obtained as a result of this investigation into crime by a criminal law enforcement agency (§ 253-a, subd. 2, par. [a]; subd. 5). The report may be submitted not only in the event that no criminal conduct has been found, but also when the grand jury, in the exercise of its broad discretion, chooses not to file an indictment or criminal information, yet feels obliged to report concerning noncriminal misconduct in public office or employment, or recommend legislative, executive, or administrative action.
Since the report is made to the court for which it was impaneled, the court is necessarily one of criminal jurisdiction, although it may also happen to have unrelated civil jurisdiction as well. The initial inquiry having been launched from the criminal side of the court and having been confined, generally, to criminal conduct, the presentation and examination of the report, concerning noncriminal misconduct, may nevertheless be rationally treated as a criminal proceeding for purposes of appeal, and, therefore, must be so treated by this court.
Equally significant is it that when the majority to reverse treat the merits they use and apply tests which arise in criminal matters. This is a manifest recognition that a grand jury report partakes more of a criminal nature than it does a civil matter. Of course, it will come as a surprise to most that a grand jury is indulging in a civil procedure when it makes a report just because it omits return of a criminal information or indictment.
Consequently, this court lacks jurisdiction of the appeal and it should be dismissed.
On the view taken of appealability it would not be necessary to consider the merits. But because complete silence might indicate agreement with the other views expressed on the. merits, some comment is required.
Initially, the view that the Constitution does not affirmatively authorize grand jury reports, a view first laid down by the court in Matter of Wood v. Hughes (9 N Y 2d 144, 150-151, supra), does not support the converse declaration that the Legis *214 lature may not by statute impose that power or duty on grand juries. This is especially true since the Constitution says very little of the powers and duties of a grand jury, except to emphasize that its power “ to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law” (art. I, § 6). Indeed, the majority in the Wood case did not assert that the Constitution barred .reports, or that they were unprecedented at common law, but rather that the Legislature ‘ ‘ manifested its intention to supplant the common law on the subject” (9 N Y 2d, at p. 149, see, also, pp. 150, 151-154).
Thus, the Wood case struck down grand jury reports only for want of a positive grant either of constitutional or legislative authority (9 N Y 2d, at pp. 153-154). Section 253-a of the Code of Criminal Procedure, since enacted, provides that positive grant of legislative authority. Consequently, the Wood case supplies no argument against the validity of the statute, but indeed supports it, although, to be sure, it is evident that as a policy matter the majority of the Wood court would not, if they were proper legislators, have favored enactment of such a statute.
But the most seriously mistaken premise in this case is the equation of investigation, whether of crime or other grave misconduct, with a criminal action. It is only in the criminal action, which is adversary and judicial, that the defendant is entitled to the full panoply of rights, including the right to counsel, to disclosure of evidence and to confrontation of witnesses. And then this is only after arrest and arraignment or upon the trial, as the case may be.
Investigations are another matter. They are normally ex parte, secret, highly confidential, and may, but do not necessarily, result in prosecutions for crime or even reports. Nor are they peculiar to the judicial branch. On the contrary they are quite often conducted by agencies of the executive or legislative branches, and just as often independently of a grand jury. They may be conducted by commissions such as the Division of Human Rights (Executive Law, §§ 290-301, esp. § 295, subd. 8), or the State Investigation Commission (L. 1958, *215 ch. 989, as last amd.), or by executive departments, such as the Attorney-General (Executive Law, § 63, esp. subds. 8, 11; General Business Law, §§ 343, 354). And, of course, the Governor’s power to direct so-called Moreland Act investigations, always resulting in reports, has now become classic (Executive Law, § 6; see, generally, Breuer, Moreland Act Investigations in New York; 1907 — 65, N. Y. State Library Bibliography Bull. 85). To apply to all these investigations, where they result in reports, the rules being applied to grand jury reports on constitutional due process grounds would be all but unthinkable and quite unsettling. Yet that would seem to be the necessary implication of the court’s present holding.
Indeed, the evils attributed to grand jury secrecy and confidentiality are present whether investigation culminates in an indictment or a report. In either event, the subject of the inquiry is incapable of heading off a publicized grand jury pronouncement, except to the limited extent he can state his own defense, independent of any knowledge of testimony supporting the indictment or the report. In either case, he cannot study the testimony, present or cross-examine witnesses, or otherwise effectively rebut the evidence. Although a defendant may ultimately succeed in vindicating himself at trial, later exoneration may be only of limited effect. A reputation may be permanently ruined in the interim between indictment and verdict, and a prosecution may be dropped before there is an opportunity for a rebuttal at trial.
The present case involves a serious matter and there is no suggestion from any source that it was improperly motivated, baseless in its institution, or biased toward the subjects of the investigation. Indeed, the report in this case is concerned with persistent and widespread larceny and corrupt misuse of the property and services of a public institution, including vast quantities of dangerous and narcotic drugs. None of this is denied. The Grand Jury, perhaps as a matter of mercy, decided to make the report, rather than institute criminal prosecutions against supervisors who knew or should have known of the conditions. It noted that the acts of misconduct had become so commonplace, and the operation of the hospital so lax and decayed, as to invite misconduct without a commensurate *216 criminal intent by the employees and officials. It recommended, however, the removal or discipline of various heads and supervisors who must have been responsible for the present condition, either because of culpable willful ignorance or knowing condonation, apart from alleged instances of their own participation in the misappropriation of public property and services.[3] To the extent that these persons held protected public positions, their discipline or removal would entail full-fledged hearings as does a criminal trial for one indicted. To the extent that they did not hold protected positions, the executive with power of removal could choose, if he wished, to give the public officer or employee a full hearing. The significant fact is that the grand jury does not and cannot remove officers or impose criminal penalties, any more than it can convict criminal defendants. It may only recommend such removal by those with the power of removal.
It must be emphasized that one is concerned here with public office and nonfeasance and neglect in such office. Current events hardly suggest that a public officer is in dire need of protection from criticism. Indeed, the United States Supreme Court in New York Times Co. v. Sullivan (376 U. S. 254), and the cases in its wake, made quite clear that, except for defamation made with “actual malice ”, a public officer will be denied a private tort remedy, however grievous the defamation. Surely, the risk of a private defamation with impunity is far greater than official defamation which has always, in the public interest, been granted at least qualified privilege (see Prosser, Torts [3d ed.], pp. 795-823).
*217 If it be thought that a grand jury, because associated with the judicial system, may not have the same freedom of investigation and report as do the executive and legislative branches, it is only necessary to note that while the grand jury is an arm of the judicial system, it is not a truly judicial body and its proceedings are only qualifiedly judicial. It is within the court system but is of the courts only in a limited sense. It is an ancient institution developed in the misty past and has survived as a unique citizens’ body to enforce the criminal laws and, hopefully, to cleanse public offices.[4]
The grand jury report, viewed in its proper perspective and not inflated to the status of a judicial pronouncement of guilt, is readily sustainable. It is a report based on the preponderance of the evidence adduced on an ex parte investigation, and not a trial. To the same extent that those named within its pages cannot review the entire record, cannot present or cross-examine witnesses, or otherwise lack the rights and safeguards afforded defendants in crimnal actions, so, too, the report cannot and should not be afforded the legal status of a judgment of conviction. There is no claim that it is. If, as contended, the import of a report is misapprehended, despite its evident limitations, the remedy is not the application 'of due process standards as though a report were a judgment of conviction or a necessary predicate to one. If the nature of a report is misunderstood (as, indeed, indictments often are) and attempts at education are unavailing, the shortcomings of the report procedure are the proper subject of legislative study, and not of constitutional prohibitions.
The interpolation by the court of a right to inspect the grand jury minutes, a right given nowhere in the particular statute and given only limitedly in the statutes and cases governing proceedings after criminal indictment, has no warrant in law, the precedents, or policy. The report statute was not designed to set up a junior brother to criminal prosecution but to over *218 come this court’s holding in Matter of Wood v. Hughes (9 N Y 2d 144, sufra) that there was no constitutional .or legislative authority for reports, and at the same time require that reports have some surveillance, on notice, lest irresponsible reports be publicly disseminated.
The majority view introduces an expanded litigation procedure (perhaps conceivably the taking of proof) before a contested report may be publicized. No other investigative official, committee, or commission is subject to a similar requirement. The most shocking discrimination, however, is that criminal defendants, with so much more at stake, have no protection or ‘ ‘ due process ’ ’ similar to. that being accorded to public officers and employees who are being criticized with less than crime. Needless to say, the principles being expressed as limited to grand jury reports affecting public office will hardly remain so confined when criminal defendants contend for a similar right and protection. Assuming, as a matter of policy, that there should be such rights and protection, it is a matter for legislative action by the constituted Legislature and not by the courts, let alone the court which the subject legislation expressly precludes from appellate jurisdiction. Not only is the Legislature primarily concerned with policy, but it may experiment and change the procedures if the legislated procedures fail to serve public ends. To make of these difficult questions a matter of constitutional mandate which the Legislature may not vary is a disservice and an .arrogation.
Accordingly, I dissent and vote to dismiss the appeal.
Judges Scileppi, Bergan and Gibson concur with Chief Judge Ftjld; Judge Burke dissents in part in a separate opinion and votes to reverse and remit the matter of the County Court with directions that the report of the Grand Jury be forever sealed; Judge Breitel dissents and votes to dismiss the appeals in a separate opinion in which Judge Jasen concurs.
Orders reversed, etc.

. The Grand Jury was impaneled November 12, 1968, and was extended by successive orders of the court to May 29, 1969. It heard 63 witnesses, received some 159 exhibits, and the transcript of its proceedings numbers 2,509 pages. Co-operating agencies besides the District Attorney and Sheriff of Erie County were the State Department of Audit and Control and the Narcotic Control Bureau of the State Department of Health.
The Grand Jury found that $5,100 wholesale value of narcotics and other dangerous drugs were unaccounted for, and at least one witness testified to weekly losses of drugs and medication of $500 per week. The drug investigation uncovered extensive misuse, and diversion of other public supplies, equipment and services to private uses, sometimes in connection with the use or exchange of drugs.

. For a generally sympathetic view of the many functions of grand juries, including its investigating and reporting powers, see Peter Megargee Brown, Ten Reasons Why the Grand Jury in New York Should be Retained and Strengthened, 22 Record of Assn. of Bar of City of N. Y. 471. See, also, the several opinions in Matter of Wood v. Hughes (9 N Y 2d 144, supra) which detail the historical background of the grand jury in Anglo-American jurisprudence.